870 F.2d 1168
 Fed. Sec. L. Rep. P 94,354
Joel STARRELS, in a derivative capacity and individually and
on behalf of all others similarly situated, Plaintiff,
v.
FIRST NATIONAL BANK OF CHICAGO, a national banking
institution, et al., Defendants-Appellees.
Appeal of Patricia Starrels BERNSTEIN, as Legatee of Joel
Starrels, deceased, individually, and in a
derivative capacity, and on behalf of
all others similarly situated.
 No. 88-1586.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 1, 1988.
Decided Feb. 24, 1989.
 
 Marshall Patner, Marshall Patner, P.C., Chicago, Ill., for appellant.
 Charles W. Douglas, Sidley & Austin, Charles W. Boand, Burke, Wilson & McIlvaine, Chicago, Ill., for defendants-appellees.
 Before WOOD and EASTERBROOK, Circuit Judges, and ESCHBACH, Senior Circuit Judge.
 ESCHBACH, Senior Circuit Judge.
 
 
 1
 This appeal challenges the district court's dismissal with prejudice of the appellant's third amended and consolidated complaint.[1] In essence, this is a shareholder derivative and class action suit asserting that the directors and officers of First Chicago Corporation ("FCC") and First National Bank of Chicago ("FNBC") have egregiously mismanaged the affairs of the corporations. The appellant raises two contentions on appeal. First, she argues that the district court erred in ruling that she was not a proper party plaintiff under Fed.R.Civ.P. 23.1. Second, the appellant contends that the district court erred in ruling that she should have made a demand upon the directors to bring this suit prior to the filing of this complaint. For the reasons stated below, we affirm the district court's dismissal with prejudice of the third amended and consolidated complaint for failure to make a demand upon the directors or to allege with particularity facts sufficient to excuse such a demand as futile. Because the appellant's failure to make a demand or allege specific facts excusing a demand prohibits her from maintaining this derivative suit, we do not need to reach the issue of whether she was a proper party plaintiff under Fed.R.Civ.P. 23.1.
 
 
 2
 * On July 16, 1985, Joel Starrels, a shareholder of FCC, filed a derivative and class action suit in the Circuit Court of Cook County, Illinois. He sued the appellees, FCC, FNBC (a wholly-owned subsidiary of FCC), their officers and directors, and Arthur Andersen & Co. (accountants for FCC and FNBC), for negligence, mismanagement, malfeasance, bad faith, abuse of discretion, breach of fiduciary duty, and waste of corporate assets. Two days later, Starrels sued the appellees in federal district court for RICO violations.
 
 
 3
 After the appellees had the state court suit removed to the federal district court, they filed motions for dismissal based on various grounds, including that Starrels had failed to comply with the requirements of Fed.R.Civ.P. 23.1 and Delaware corporate law because he did not make a demand upon the directors to bring this suit or allege with particularity why such demand would be futile. Instead of responding to the motion to dismiss, on December 6, 1985, Starrels filed an amended and consolidated complaint. The defendants again filed motions to dismiss arguing in part that Starrels did not allege with particularity why demand upon the directors would be futile.
 
 
 4
 On January 30, 1986, Starrels died. Pursuant to the terms of his will, the executor assigned some of his stock in FCC to Patricia Starrels Bernstein, the appellant. On June 24, 1986, Bernstein filed a second amended and consolidated complaint naming herself as the substitute derivative plaintiff. Once again, the appellees responded by filing motions to dismiss for failing to allege with particularity why demand would be futile and by opposing the substitution of Bernstein as plaintiff.
 
 
 5
 On December 15, 1986, the district court dismissed without prejudice Bernstein's second amended and consolidated complaint for failing to comply with Fed.R.Civ.P. 23.1. First, the court found that under Rule 23.1 and Delaware law the plaintiff should have made a demand upon the directors to bring this suit. Second, the court found that Bernstein did not receive her stock in FCC "by operation of law" as required by Rule 23.1, therefore, she was not a proper party plaintiff. On February 18, 1987, Bernstein moved for leave to file a third amended and consolidated complaint. One year later, the district court dismissed her third amended and consolidated complaint with prejudice.[2]
 
 II
 
 6
 The appellant contends that the district court erred in ruling that under FED.R.CIV.P. 23.1 she should have made a demand on the directors to bring this suit. Bernstein does not claim that she had made such a demand upon the directors. Rather, she argues that a demand was excused because it would have been futile.[3] Whether the appellant was required to make a demand before bringing this suit is an issue left to the discretion of the district court. Therefore, assuming no error of law has been made, we review its determination under an abuse-of-discretion standard. Nussbacher v. Continental Ill. Nat'l Bank & Trust Co., 518 F.2d 873, 878 (7th Cir.1975), cert. denied, 424 U.S. 928, 96 S.Ct. 1142, 47 L.Ed.2d 338 (1976); Fields v. Fidelity Gen. Ins. Co., 454 F.2d 682, 684-85 (7th Cir.1972); accord Gaubert v. Federal Home Loan Bank Bd., 863 F.2d 59, 68 n. 10 (D.C.Cir.1988); Kaster v. Modification Sys., 731 F.2d 1014, 1018 (2d Cir.1984); Lewis v. Graves, 701 F.2d 245, 248 (2d Cir.1983); Greenspun v. Del E. Webb Corp., 634 F.2d 1204, 1208 (9th Cir.1980).
 
 Rule 23.1 provides in pertinent part:
 
 7
 In a derivative action brought by one or more shareholders ... [t]he complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors ... and the reasons for his failure to obtain the action or for not making the effort.
 
 
 8
 FED.R.CIV.P. 23.1 (emphasis added). This rule does not always require a shareholder to make a demand upon the directors in order to bring a derivative suit. If the shareholder does not make such a demand, he need only state with particularity why such a demand would have been futile. Nussbacher, 518 F.2d at 877; see Lewis, 701 F.2d at 248; Cramer v. General Tel. & Elecs. Corp., 582 F.2d 259, 276 (3d Cir.1978), cert. denied, 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90 (1979). It is not enough for the shareholder "to state in conclusory terms that he made no demand because it would have been futile." 7C C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE Sec. 1831, at 117 (1986).
 
 
 9
 Rule 23.1 "concerns itself solely with the adequacy of the pleadings; it creates no substantive rights." Daily Income Fund, Inc. v. Fox, 464 U.S. 523, 544, 104 S.Ct. 831, 842, 78 L.Ed.2d 645 (1984) (Stevens, J., concurring). Any substantive rights that directors of a corporation may have in a demand requirement revolves around state law. See Burks v. Lasker, 441 U.S. 471, 477-78, 99 S.Ct. 1831, 1837, 60 L.Ed.2d 404 (1979) ("As we have said in the past, the first place one must look to determine the powers of corporate directors is in the relevant State's corporation law." (citations omitted)); Lewis v. Curtis, 671 F.2d 779, 785 (3d Cir.1982) (noting that a plaintiff's allegations must show under state law that the directors lacked disinterestedness).[4] Therefore, we must look to the law of Delaware, the state of incorporation of FCC, to determine the substantive rights of the appellees. The issue, then, is whether the appellant's third amended and consolidated complaint states with particularity (federal procedural requirement under Rule 23.1) facts which would excuse a demand upon the directors as futile under Delaware corporate law (substantive state law). See Cottle v. Hilton Hotels Corp., 635 F.Supp. 1094, 1097 (N.D.Ill.1986).
 
 
 10
 Under Delaware law, the rule that a shareholder must make a demand upon a corporation's directors before initiating a derivative suit, unless such demand would be futile, is more than a mere pleading requirement; it is a substantive right. Aronson v. Lewis, 473 A.2d 805, 809 (Del.1984); Haber v. Bell, 465 A.2d 353, 357 (Del.Ch.1983). The standard for determining whether a complaint adequately alleges demand futility is: "whether taking the well-pleaded facts as true, the allegations raise a reasonable doubt as to (i) director disinterest or independence or (ii) whether the directors exercised proper business judgment in approving the challenged transaction." Grobow v. Perot, 539 A.2d 180, 186 (Del.1988); accord Pogostin v. Rice, 480 A.2d 619, 624 (Del.1984); Aronson, 473 A.2d at 814; Good v. Getty Oil Co., 514 A.2d 1104, 1107 (Del.Ch.1986). Moreover, conclusory allegations of fact or law contained in the complaint need not be considered true in determining demand futility unless they are supported by specific facts. Grobow, 539 A.2d at 187; Kaufman v. Belmont, 479 A.2d 282, 285 (Del.Ch.1984).
 
 
 11
 In the case before us, the appellant does not claim that the directors were in any way interested in the transactions of which she complains. Rather, Bernstein asserts that the directors' actions were not the product of proper business judgment. Therefore, we need to examine Bernstein's third amended and consolidated complaint only to see if it raises a reasonable doubt that the directors exercised proper business judgment. Under Delaware law, this requires us to look at both the substantive due care (substance of the transaction) as well as the procedural due care (an informed decision) used by the directors. See Grobow, 539 A.2d at 189.
 
 
 12
 The appellant makes several allegations challenging the substantive due care used by the directors. In her third amended and consolidated complaint, Bernstein lists numerous transactions which she claims were not the product of proper business judgment. First, she alleges that FNBC and FCC, acting under the domination, direction, or control of the officers and directors, entered into a series of loans and a contract with companies affiliated with Nelson Bunker Hunt and W. Herbert Hunt, which resulted in losses totaling more than one hundred million dollars. She particularly complains that FNBC did not require collateral for some of these loans. See Plaintiff's Third Amended and Consolidated Complaint, Rec. 77, at 9-12 [hereinafter Complaint]. Nowhere in her complaint, however, does Bernstein allege specific facts showing that these loans were "devoid of a legitimate corporate purpose." See Pogostin, 480 A.2d at 626. At most, her allegations merely show with hindsight that these loans were a mistake.
 
 
 13
 Bernstein's third amended and consolidated complaint also criticizes FCC's decision to purchase a 44.5% interest in a Brazilian bank and to guarantee the Brazilian bank's deposits. This investment resulted is significant losses to FCC. Her complaint, however, also notes that the investment was purportedly made in order to facilitate lending to multinational corporations in local currency. See Complaint, at 12-14. Clearly, this is a valid reason to invest in a foreign bank. Moreover, the complaint fails to allege with particularity any improper motive or conflict of interest on the part of the directors and officers in deciding to make this investment. Therefore, this transaction can hardly be considered "so egregious on its face that [it] cannot meet the test of business judgment." Aronson, 473 A.2d at 815.
 
 
 14
 The third amended and consolidated complaint further alleges impropriety in the awarding of $1.5 million in bonuses to top management. See Complaint, at 15-16. The complaint, however, is void of any specific allegations of fact showing why these bonuses were improper; for example, the complaint lacks facts which would support a claim that these bonuses amounted to a waste of corporate assets. Indeed, we note that Delaware corporate law gives directors broad powers to provide suitable compensation for a corporation's officers. See DEL.CODE ANN. tit. 8, Sec. 122(5). Thus, the appellant has failed to create a reasonable doubt about whether these bonuses were the product of the directors' business judgment.[5]
 
 
 15
 Bernstein's third amended and consolidated complaint also criticizes the directors' procedural due care in entering into the challenged transactions. She alleges that many of these transactions were "made without regard for adequate approval, or review auditing procedures." Complaint, at 17. She further alleges that, in deciding to invest in the Brazilian bank, the directors "failed to take steps to fully comprehend the financial situation" of the Brazilian bank and did not "adequately study the situation." Id. at 13. Notably absent from her complaint, however, are specific facts describing what steps the directors did not take in informing themselves or how they could have better informed themselves before entering into the challenged transactions. Thus, these bare conclusory allegations are not enough to cast a doubt on whether these transactions were the products of the directors' business judgment.
 
 
 16
 Contrary to the appellant's claim, her third amended and consolidated complaint does not allege with particularity facts which would have excused her from making a demand upon the directors.[6] Therefore, we cannot say that the district court abused its discretion in determining that this was a demand-required case and in dismissing with prejudice Bernstein's third amended and consolidated complaint for failure to make a demand or to allege with particularity why such a demand would be futile. Because Bernstein's failure to make a demand prohibits her from maintaining this derivative suit, we do not need to decide whether she was a proper party plaintiff under FED.R.CIV.P. 23.1.
 
 III
 
 17
 For all the foregoing reasons, the judgment of the district court is
 
 
 18
 AFFIRMED.
 
 
 19
 EASTERBROOK, Circuit Judge, concurring.
 
 
 20
 Delaware excuses demand on directors in a derivative suit when
 
 
 21
 under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.
 
 
 22
 Aronson v. Lewis, 473 A.2d 805, 814 (Del.1984). See also Pogostin v. Rice, 480 A.2d 619, 624-25 (Del.1984); Grobow v. Perot, 539 A.2d 180, 183, 186 (Del.1988). The court uses this standard, and I join its opinion. Having applied Delaware's law as best we can, we might move on to other business. This case illustrates, however, the difficulty courts have had with the rule of Aronson--which in Grobow led the Supreme Court of Delaware to dress down the Chancellor for misunderstanding the rule. Perhaps a federal judge may be forgiven the temerity of suggesting to members of the state bench that the problem lies not in the Chancellor's appreciation of Aronson but in the approach taken by that case. This is a subject of mutual interest, not only because Aronson governs proceedings directly in diversity cases but also because federal courts apply their own demand rules when claims are based wholly on federal law, and in the latter they must decide whether to absorb into the body of federal law the rule stated by Aronson.
 
 
 23
 Why must shareholders demand that corporations act before filing suit? The rule could reflect a hope that the dispute will go away without litigation, that the board of directors will "do something" (or persuade the putative plaintiff that suit is pointless). Demand then initiates a form of alternative dispute resolution, much like mediation. Steps to control the volume of litigation are welcome, and courts give this as a justification for the demand rule. It is not, however, a powerful one, because on balance the rule creates more litigation than it prevents. It is difficult to identify cases in which the board's response to a demand satisfied the shareholder and thus prevented litigation; even if the board acts the shareholder may believe the board did too little. It is easy to point to hundreds of cases, including this one, in which the demand requirement was itself the centerpiece of the litigation.
 
 
 24
 An approach uncertain in scope and discretionary in operation--that is, any rule except one invariably requiring or excusing demand--promotes litigation. When the stakes are high (as they frequently are in cases of this character), even a small disagreement between the parties about the application of a legal rule makes it difficult to resolve disagreements peaceably. It will be especially hard to resolve disputes out of court when, as in Delaware, making a demand affects the merits. A demand may be understood to concede that the board of directors possesses the discretion not to pursue the claim--and to block the investor's pursuit of it too. See Zapata Corp. v. Maldonado, 430 A.2d 779 (Del.1981). The case reports overflow with decisions concerning the demand requirement, and under Aronson's approach litigation to determine whether a demand should have been made entails questions closely associated with "the merits". As a way to curtail litigation, the demand rule is a flop.[1]
 
 
 25
 The persuasive rationale for the demand requirement is that it allows directors to make a business decision about a business question: whether to invest the time and resources of the corporation in litigation. See Daily Income Fund, 464 U.S. at 532-33, 104 S.Ct. at 836-37; Aronson, 473 A.2d at 811-13; Deborah A. DeMott, Demand in Derivative Actions: Problems of Interpretation and Function, 19 U.C. Davis L.Rev. 461, 484-94 (1986); Daniel R. Fischel, The Demand and Standing Requirements in Stockholder Derivative Actions, 44 U. CHI.L.REV. 168, 171-72 (1976). Firms must make operational decisions; if these misfire, they must decide what to do next. Each decision must be made with the interests of the corporation at heart. Whether to fire a negligent employee, or to extend another chance, is no less a "business decision" than the choice to hire him initially or approve his strategy. So too the decision to file a lawsuit or choose something simpler--discharge, demotion, dressing-down, ratification--in the wake of questionable conduct. Even doing nothing is justified when the resources of top managers required to act exceed the injury to the firm; when "something must be done", acts short of litigation could have net benefits exceeding those of litigation. If the directors run the show, then they must control litigation (versus other remedies) to the same extent as they make the initial business decision. They may conclude that internal remedies such as discharge or a reduction in compensation are more cost-effective for the firm. A lawsuit that seems to have good prospects and a positive value (net of attorneys' fees) still may be an unwise business decision because of the value of managerial time that would have to be invested, time unavailable to pursue the principal business of the corporation. Similarly, a lawsuit that appears to have a negative net value may be useful to the firm if it deters future misconduct.
 
 
 26
 Choosing between litigation and some other response may be difficult, depending on information unavailable to courts and a sense of the situation in which business executives are trained. Managers who make such judgment calls poorly ultimately give way to superior executives; no such mechanism "selects out" judges who try to make business decisions. In the long run firms are better off when business decisions are made by business specialists, even granting the inevitable errors. If principles such as the "business judgment rule" preserve room for managers to err in making an operational decision, so too they preserve room to err in deciding what remedies to pursue.
 
 
 27
 This rationale need not, however, imply universal demand. If courts would not respect the directors' decision not to file suit, then demand would be an empty formality. Perhaps the directors are interested in the transaction, so that they have a financial stake in the transaction and bear the burden of establishing its propriety. In such duty-of-loyalty cases courts frequently say that demand would be "futile". Or perhaps all of the directors are so ensnarled in the transaction that even when only the duty of care is at stake, their judgment could not be respected. Again demand would be an empty gesture. Delaware attempts to identify these cases and excuse demand in them.[2]
 
 
 28
 Aronson surveys these justifications and limits. The court observes that a decision not to sue is a business judgment. "[A] conscious decision to refrain from acting may nonetheless be a valid exercise of business judgment and enjoy the protections of the [business judgment] rule .... Unless the business judgment rule does not protect the refusal to sue, the shareholder lacks the legal managerial power to continue the derivative action". 473 A.2d at 813. Yet the rule of law devised in Aronson does not track the court's own remarks. The rule bears repeating; the court must ask whether
 
 
 29
 under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.
 
 
 30
 Part (1) of this inquiry asks whether the directors' business decision not to sue would be respected. Part (2) asks whether the original decision is sheltered from liability by the business judgment rule. Aronson, Pogostin, and Grobow tell us that if the shareholder satisfies either part of the inquiry, demand is unnecessary. Yet this cuts even a disinterested board out of the process whenever there is a serious question about the status of the challenged conduct, denying the firm the initial opportunity to make a business decision whether to pursue litigation although there may be no reason to doubt the integrity of the board's decision.
 
 
 31
 If the original decision--that is, the decision to engage in "the challenged transaction"--was the product of a "valid exercise of business judgment", then the directors cannot in good faith authorize litigation. Only if there is a "reasonable doubt" about the application of the business judgment rule to the decision to undertake the "challenged transaction" may the firm litigate in its own name. The upshot of Aronson is that whenever the board may pursue litigation, demand is unnecessary; but when litigation would be an abuse of process, demand is required so that the board can make up its mind. Why should demand be excused when it might be useful and required only when the outcome is foredoomed? Judge Seitz, who served on the chancery court of Delaware for 20 years (and was Chancellor for 15) wrote in Lewis v. Curtis, 671 F.2d 779, 786 (3d Cir.1982), that a plaintiff need not allege that the challenged transaction was unprotected by the business judgment rule and that courts should inquire instead whether the board could make a valid business judgment in response to a demand. That inquiry is more in line with the rationales of the demand requirement limned in Aronson than is the rule stated in Aronson.
 
 
 32
 Most of the "challenged transaction[s]" in today's case were authorized by managers who do not sit on the board. Some were down a considerable distance in the corporate hierarchy. Why would the exposure of these employees of the firm to liability (on the ground that their deeds are not sheltered by the business judgment rule) eliminate the need to make demand on the board? The board of a corporation wants as much as any shareholder to prevent and punish delicts by subordinate managers--probably they want to do so even more urgently, because members of the board are likely to hold larger stakes in the firm than are shareholder-plaintiffs. See Harold Demsetz & Kenneth Lehn, The Structure of Corporate Ownership: Causes and Consequences, 93 J.Pol.Econ. 1155 (1985). This board, in particular, was concerned about these gaffes, in particular. Counsel informed us at oral argument that heads have rolled as a result of the transactions against which the complaint rails, and that some suits have been filed. Ironically, the fact that the board "did something" should be the magic arrow in plaintiff's quiver, for it suggests that the transactions were not sheltered by the business judgment rule. Such a topsy-turvy approach generates little other than mirth, however, which may be why the plaintiff did not pursue the point, and why this court can write that a sequence of events that had led to legal action did not create even a "reasonable doubt" about the protection of the business judgment rule.
 
 
 33
 Self-contradiction is not the only problem with the formulation of Aronson. The reference to "reasonable doubt" summons up the standard applied in criminal law. It is a demanding standard, meaning at least a 90% likelihood that the defendant is guilty. See C.M.A. McCauliff, Burdens of Proof: Degrees of Belief, Quanta of Evidence, or Constitutional Guarantees?, 35 Vand.L.Rev. 1293, 1325-32 (1982) (reporting a survey of federal judges). See also Branion v. Gramly, 855 F.2d 1256, 1263 n. 5 (7th Cir.1988); United States v. Hall, 854 F.2d 1036, 1043-44 (7th Cir.1988) (concurring opinion). If "reasonable doubt" in the Aronson formula means the same thing as "reasonable doubt" in criminal law, then demand is excused whenever there is a 10% chance that the original transaction is not protected by the business judgment rule. Why should demand be excused on such a slight showing? Surely not because courts want shareholders to file suit whenever there is an 11% likelihood that the business judgment rule will not protect a transaction. Aronson did not say, and later cases have not supplied the deficit. If "reasonable doubt" in corporate law means something different from "reasonable doubt" in criminal law, however, what is the difference?, and why use the same term for two different things?
 
 
 34
 A final oddment in the Aronson approach. Rule 23.1 and its parallel in Delaware practice require the court to determine at the pleading stage whether demand was necessary. This requires courts to adjudicate the merits on the pleadings, for a decision that the business judgment rule shelters the challenged conduct is "the merits" in derivative litigation, and under Aronson also shows that demand was necessary. It is a bobtailed adjudication, without evidence. If facts suggesting (at the one-in-ten level) that the business judgment rule will not prevent recovery have come to light, the investor may plead them and litigate further, setting the stage for still another decision about the scope of the business judgment rule. See Grobow, 539 A.2d at 186-87 (noting the link between the demand requirement and the need for discovery). If facts of this character would come to light only with discovery, then demand is necessary and plaintiff may not litigate at all--for in Delaware a demand-required case is one the board may elect to prevent or dismiss under Zapata. The amount of information in the public domain is unrelated to the ability of the board to make a business judgment concerning litigation, is unrelated indeed to any function of the demand requirement. Why should the board acquire the power to dismiss under Zapata just because the plaintiff needs discovery and so cannot make the required showing "with particularity" in the complaint? Aronson and its successors do not discuss the point.
 
 
 35
 A rule of universal demand, as the American Law Institute has proposed, would avoid these difficulties. If Delaware thinks it wise to distinguish demand-required and demand-excused cases, then a rule requiring demand unless the board is so wrapped up in the transaction that it cannot be relied on to make a business decision about the wisdom of litigation would do nicely. It would reflect the functions of having a demand rule in the first place. A rule excusing demand when there is a serious question about the status of the "challenged transaction" does not respond to the reasons for thinking demand useful, and one wonders whether it might be better to have no demand requirement at all than to excuse demand when the board might want to sue and compel demand when the board could not responsibly litigate.
 
 
 
 [1]
 The plaintiff originally filed two separate causes of action, one in Illinois state court and the other in federal district court. The state court suit was removed to federal court on the basis of 12 U.S.C. Sec. 632, which gives the district courts jurisdiction over actions arising out of international banking. The federal district court then allowed the plaintiff to file an amended complaint which consolidated the two separate causes of action
 
 
 [2]
 It is unclear from the record whether the district court granted the appellant's motion for leave to file a third amended and consolidated complaint. Therefore, we consider his dismissal with prejudice to be a dismissal of both the second and third amended and consolidated complaints. Although in our opinion we refer to the third amended and consolidated complaint in disposing of this appeal, our analysis and result would be the same for the second amended and consolidated complaint. Moreover, although the district court dismissed this action with prejudice in a two-sentence order, we assume that it was dismissed for the same reasons contained in the court's order dismissing the second amended and consolidated complaint. See District Court's Memorandum and Order, Rec. 74 (dismissing the plaintiff's second amended and consolidated complaint)
 
 
 [3]
 The appellant's third amended and consolidated complaint states:
 A demand on the Chairman, Board of Directors or officers would be purely ministerial, a useless formality and a futile act, in light of the allegations above. This conduct by the Chairman and the members of the Board of Directors of the First National Bank and of First Chicago, and by the officers of FNBC and FCC named, each of whom acted together without dissent and in a unified manner. The challenged transactions, which inter alia violated bank procedures, rules and representations to holders, cast a reasonable doubt that the directors and officers acted in good faith, absent a gross abuse of discretion, and that such actions were not the product of a valid exercise of business judgment. As such, those transactions sterilized the directors' ability to properly conduct this litigation. In addition, as the conduct of these defendants was known to them but not to plaintiff, a demand seeking to cease such conduct was not possible, and the actions complained of each was a fait accompli. Demand would permit merely the Board to delay action to the detriment of the Corporation, plaintiff and the other shareholders.
 Plaintiff's Third Amended and Consolidated Complaint, Rec. 77, at 20-21.
 
 
 [4]
 Although we consider the demand requirement to be an issue of state law, we note that other courts apparently assume that federal law controls both the pleading requirement as well as the underlying demand requirement. See Kaster v. Modification Sys., 731 F.2d 1014, 1017-18 (2d Cir.1984); Greenspun v. Del E. Webb Corp., 634 F.2d 1204, 1208-10 (9th Cir.1980); see also 7C C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE Sec. 1831, at 100 ("Federal law governs the issue whether plaintiff has made a sufficient demand on the directors.")
 
 
 [5]
 In her third amended and consolidated complaint, Bernstein also complains of other transactions which resulted in monetary losses to FCC and FNBC. Similar to the allegations discussed in this opinion, Bernstein fails to allege with particularity facts to support her broad, conclusory statements. Therefore, these allegations also fail to cast a reasonable doubt on whether these transactions were the products of the directors' business judgment
 
 
 [6]
 The appellant argues that her third amended and consolidated complaint sufficiently alleges facts which excuse a demand, especially in light of the fact that she was not allowed to undertake discovery. The district court entered a stay of discovery in October and again in November of 1985. See Rec. 16; Rec. 18. The record, however, contains no evidence that the appellant tried to lift the stay until approximately ten months later when she filed a motion for discovery. See Plaintiff's Motion for Discovery with Supporting Authorities, Rec. 52. Moreover, on appeal the appellant does not challenge the district court's refusal to allow her to conduct discovery. Under these circumstances, the appellant cannot now excuse the lack of specific allegations in her third amended and consolidated complaint on the ground that she was not allowed to conduct discovery
 
 
 [1]
 Even without the link between demand and the board's ability to squelch the suit, there is a steady flow of litigation about the demand requirement. Why this should occur is something of a mystery. Why should shareholders prefer costly litigation about the need for a demand to the cheap expedient of making one? Is it to get priority in the queue for attorneys' fees if multiple suits are filed? (Courts could establish what amount to property rights with priority from the making of the demand, reducing this source of litigation.) Is it the need to beat the statute of limitations? Unlikely, for there is usually ample time to act. Is it the time pressure in transactions affecting corporate control? This might account for many suits but can't account for Starrels's. Anyway, it would be simple to require demand as soon as practicable even if the rush of events justifies expeditious litigation
 
 
 [2]
 Whether the game is worth the candle is a different question. Difficulties in sorting cases into demand-required and demand-excused bins might justify a universal requirement, with the understanding that requiring demand does not always give the corporation authority to block litigation. There is much to recommend the American Law Institute's proposal to require universal demand and decouple that requirement from doctrines concerning the board's ability to prevent or dismiss derivative litigation. Principles of Corporate Governance: Analysis and Recommendations Secs. 7.03, 7.08, and commentary at 64-71 (Tent. Draft No. 8, 1988). (Section 7.03(b) of Tentative Draft No. 8 would excuse demand when "irreparable injury to the corporation would otherwise result", but the Institute voted to require the shareholder to serve demand even after commencing a suit in advance of demand in reliance on feared "irreparable injury".)